**D.C. TRANSPORTATION SERVICES, INC., dba Commercial Drivers, Plaintiff,**

v.

**The COCA–COLA BOTTLING COMPANY OF NORTHERN OHIO, et al., Defendants.**

No. 5:94 CV 305.

United States District Court, N.D. Ohio, Eastern Division.

May 16, 1994.

Charles M. Rosenberg, Maynard A. Buck, III, Benesch, Friedlander, Coplan & Aronoff, Cleveland, OH, for plaintiff.

Hugh E. McKay, David Andrew Bell, Porter, Wright, Morris & Arthur, Stephen F. Gladstone, Thomas Jeffrey Piatak, Thompson, Hine & Flory, Cleveland, OH, for defendants.

### MEMORANDUM OPINION

DOWD, District Judge.

Before the Court are two motions to dismiss, one filed by defendants The Coca–Cola Bottling Company of Northern Ohio, The Akron Coca–Cola Bottling Company, Johnston Great Lakes Canning, Inc., Great Lakes Canning, Inc. and Soft Drink Carriers, Inc. (collectively, "CCB")[1] (Docket No. 11), and the other filed by the remaining defendant, ABARTA Transportation Services, Inc. ("ABARTA") (Docket No. 12). Both CCB and ABARTA seek dismissal of Count II for failure to state a claim and of Counts I and III for lack of subject matter jurisdiction.[2]

The Court is of the view that the parties' briefing of the issues presented and their submission of matters outside the pleadings has converted the motions to dismiss to motions for summary judgment under Fed. R.Civ.P. 56. The Court has treated the motions as such. *See,* Fed.R.Civ.P. 12(b).[3]

For the reasons discussed below, both motions are granted in part. Summary judgment is granted in favor of both CCB and ABARTA on Count II, the only federal claim. Summary judgment is denied on the state claims in Counts I and III, which counts are dismissed, pursuant to 28 U.S.C. § 1367(c)(3), without prejudice to plaintiff's right to assert those claims in the appropriate state court.

### I. FACTUAL BACKGROUND

On February 15, 1994, plaintiff D.C. Transportation Services, dba Commercial Drivers ("Commercial Drivers") filed its complaint against the six defendants asserting jurisdiction under 28 U.S.C. § 1331 (federal question) and 29 U.S.C. § 1132 (Employment Retirement Income Security Act ["ERISA"]).

Commercial Drivers is in the business of leasing truck drivers and related personnel to customers. The complaint alleges that Commercial Drivers entered into leasing contracts with CCB[4] in February 1977 and De-

---

1. The Coca–Cola Bottling Company of Northern Ohio ("CCBCNO") is the successor-in-interest to the other four defendants in this group.

2. Response and reply briefs have also been submitted for each motion. (Docket Nos. 14, 15, 17 and 20).

3. By letter to the Court dated April 22, 1994, plaintiff's counsel asked the Court to defer its ruling on the motions pending the outcome of a commercial arbitration. CCB, by letter dated May 4, 1994, opposes holding the motions in abeyance. The Court received another letter from plaintiff's council, by facsimile on May 13, 1994, repeating the request to defer a ruling and indicating that the arbitrator's award would probably be issued within ten days.

The Court has spent a good deal of time on the instant motions and sees no reason why a ruling should not issue. The parties, particularly the defendants, are entitled to know where they stand.

4. The actual agreements were entered into with predecessors of CCBCNO, specifically Soft Drink Carriers, Inc. and Great Lakes Canning, Inc. Since CCBCNO is the successor in interest to these and other defendants, and since CCBCNO and the other defendants are herein referred to collectively as "CCB," it is simpler to say that CCB entered into the contracts. More specificity is not required for the instant motions.

cember 1986 and with ABARTA in August 1991. Under the terms of each contract, Commercial Drivers ("the Lessor") essentially agreed to provide qualified truck drivers in return for reimbursement by CCB and ABARTA (each "the Lessee" under their respective contracts) of gross compensation, various payroll taxes and insurance costs related to the Lessor's employment of each driver.[5]

The leased drivers were members of Teamsters Local 293 ("the Union"). The terms and conditions of their employment were governed by collective bargaining agreements ("CBA"), which, among other things, required pension contributions to the Union's Pension Fund ("the FUND"). Commercial Drivers made the contributions and then, under the terms of the respective leasing agreements, was reimbursed by CCB and ABARTA.

In August of 1991, CCB terminated its leasing agreement. In August of 1992, ABARTA terminated its leasing agreement. As a result of the terminations, Commercial Drivers discontinued its payments into the FUND. This triggered a provision in the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381–1453,[6] under which an employer who partially or completely withdraws from a multiemployer pension plan must contribute to the plan a proportionate share of the unfunded, vested benefits.[7]

Pursuant to MPPAA, on October 20, 1992, the FUND assessed withdrawal liability against Commercial Drivers.[8] The total liability assessed, including interest, was $348,-528.00. Despite plaintiff's protestations that it was not the "employer" for MPPAA pur-

poses, the Trustees of the FUND persisted in their view that plaintiff was liable for the withdrawal.[9]

Still maintaining that it was not really the "employer," Commercial Drivers, pursuant to the leasing agreement between it and CCB, initiated commercial arbitration[10] of the question of its entitlement to contractual indemnification of the withdrawal liability.

The commercial arbitration with CCB eventually ended with an award in favor of Commercial Drivers on August 30, 1993.[11] The arbitrator issued an indemnification award of $63,858.00 for amounts already paid and indicated that Commercial Drivers should send invoices for subsequent payments.[12] The arbitrator further ordered as follows:

Claimant [Commercial Drivers] is ordered to cooperate fully with Respondents [CCB] in the assertion of any and all defenses which may be presented to oppose a finding of withdrawal liability ..., including the initiation of any arbitration proceedings pursuant to 29 U.S.C. § 1401 upon the written request of any Respondent to do so. If so requested, Claimant shall initiate such arbitration and shall request that Respondents be made parties to the arbitration. In the event the arbitrator of any such arbitration refuses to make Respondents parties to the arbitration, Claimant shall provide Respondents with full opportunity to be heard through the presentation of Claimant's defense against the Pension Plan claims of withdrawal liability.

Plaintiff filed in the Court of Common Pleas an application to reduce the arbitration

---

5. Relevant provisions of each of the three leasing contracts are attached to this Memorandum Opinion as Appendices A, B and C.

6. MPPAA amended the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq.

7. See Section II, infra, for a discussion of the framework and purpose of this statute.

8. A copy of the assessment correspondence is part of Exhibit D of plaintiff's complaint.

9. A series of letters regarding the withdrawal liability are found attached to plaintiff's respons-

es to the respective motions (Docket No. 14, Exhibits A–C; Docket No. 17, Exhibits A–F).

10. The 1986 leasing agreement required arbitration of contract disputes through the American Arbitration Association.

11. A copy of the award is Exhibit D to the Complaint.

12. The arbitrator was working from the amount originally assessed, which was apparently payable in quarterly installments.

award to judgment. Upon CCB's motion, the court vacated the award on December 10, 1993 and ordered a rehearing by the arbitrator "to be limited to the 1986 agreement." [13] It does not appear that any ruling has yet been made upon remand.

Commercial Drivers and ABARTA arbitrated the same question in a separate proceeding with a different arbitrator. On August 30, 1993, that arbitrator issued an indemnification award in favor of Commercial Drivers. [14] The arbitrator found that ABARTA was responsible for only that portion of the withdrawal liability attributable to services actually performed for ABARTA, not for the entire amount. The arbitrator noted that such amount "has not yet been determined" and that ABARTA had no duty to pay its portion until Commercial Drivers made a specific demand.

On September 10, 1993, Commercial Drivers availed itself of the MPPAA provision for resolution of disputes regarding withdrawal liability, *See,* 29 U.S.C. § 1401(a), by initiating arbitration proceedings with the FUND. In the course of the proceedings, CCB and Commercial Drivers jointly sought leave for CCB to join the arbitration.

The arbitrator directed the parties to brief the issue. Although CCB wanted to be part of the proceedings, apparently to have some say in the ultimate determination of the *amount* of liability,[15] it strenuously objected to having the arbitrator decide the question of who among the parties was the "employer" for MPPAA purposes. CCB argued that this was not within the jurisdiction of the arbitrator but was a matter for a federal court. The arbitrator ultimately denied the motion to join CCB.[16]

On January 11, 1994, before the arbitration was complete, Commercial Drivers reached a favorable settlement with the FUND as to the amount of the withdrawal liability.[17]

Commercial Drivers immediately demanded of ABARTA payment of the entire withdrawal liability resulting from the settlement with the FUND, assertedly pursuant to the commercial arbitration award. ABARTA refused, insisting that its liability under the arbitration award was only for services performed for it under its leasing agreement with Commercial Drivers, *not* for the entire amount.[18]

On February 15, 1994, plaintiff filed its complaint, setting forth three counts. Count I, a state law breach of contract claim, alleges that CCB and ABARTA have breached their leasing contracts with Commercial Drivers by failing to indemnify Commercial Drivers for the withdrawal liability. Count II, asserted under ERISA, alleges that CCB and ABARTA, as the real "employers" under MPPAA, are entirely responsible for the withdrawal liability assessed against Commercial Drivers. Count III seeks to enforce the commercial arbitration award against ABARTA. Plaintiff, in its response to ABARTA's motion, asserts that jurisdiction over this count of the complaint is under the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* For the reasons discussed below, the Court

13. Only the 1986 leasing agreement between Commercial Drivers and CCB required arbitration of contractual disputes. The Common Pleas Judge apparently felt that the arbitrator had considered the dispute under both the 1977 and 1986 agreements and had thus exceeded his jurisdiction. *See,* Complaint, ¶ 25.

14. A copy of the award is Exhibit F to the Complaint.

15. It appears to the Court that CCB must have anticipated that Commercial Drivers would file suit in federal court seeking a legal determination regarding who was the "employer." In the event that CCB was ultimately ruled the "employer," it no doubt wanted to be part of the arbitration determining the amount of liability, especially if the arbitration was not stayed pending the federal court's determination, so as to protect its potential interests.

16. A copy of the denial order is Exhibit M to plaintiff's response to CCB's motion. (Docket No. 14).

17. A definitive settlement agreement has not been executed to date. (Plaintiff's Response, Docket No. 14, at 9, n. 18). However, in paragraph 28 of the Complaint plaintiff asserts that the settlement was for Commercial Drivers to pay a total of $106,000.00 to the FUND by March 31, 1994. Since that date is now past, presumably the amount has been paid.

18. Copies of counsel's correspondence on this issue are Exhibits I and J to plaintiff's response to ABARTA's motion. (Docket No. 17).

finds that this count of the complaint is simply another variety of a state law breach of contract claim.

## II. THE APPLICABLE STATUTORY FRAMEWORK

A brief overview of the statutory scheme governing employee pension benefits is helpful. Congress enacted the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.*, to assure that pension benefits which had been promised would also be received by employees upon retirement. As multiemployer plans developed, Congress became concerned about the stability of these plans. Therefore, in 1980, Congress enacted the Multiemployer Pension Plan Amendments Act, 29 U.S.C. § 1381, *et seq.*, which provides that

> (a) If an *employer* withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability.

29 U.S.C. § 1381(a) (emphasis added).

The MPPAA itself contains no definition of "employer." Determination of who is an employer for purposes of MPPAA is one for the courts. *Schaffer v. Eagle Industries, Inc.*, 726 F.Supp. 113, 114 (E.D.Pa.1989); *Tri-State Rubber & Equipment, Inc. v. Central States Southeast & Southwest Areas Pension Fund*, 661 F.Supp. 46, 48 (E.D.Mich.1987).[19]

An employer's withdrawal liability under MPPAA "is the amount determined under Section 1391 . . . to be the allocable amount of unfunded vested benefits" adjusted by certain factors. 29 U.S.C. § 1381(b)(1). Section 1391 sets out methods for computing withdrawal liability.

The MPPAA also contains dispute resolution provisions because "the employer and the [Pension] Plan may not always be in agreement as to the computation of withdrawal liability." *Marvin Hayes Lines, Inc. v. Central States Southeast & Southwest Areas Pension Fund*, 814 F.2d 297, 299 (6th Cir.1987).

Once the plan sponsor determines that an employer has completely or partially withdrawn from a pension plan,[20] it must notify the employer of the amount of liability, present a schedule for payment, and demand same. 29 U.S.C. §§ 1382, 1399(b)(1). Within 90 days of receipt of this notice, the employer may seek review by the plan sponsor of any matter relating to the assessment of liability or the payment schedule. 29 U.S.C. § 1399(b)(2)(A). After review, the plan sponsor must notify the employer of its decision and include its reasons. 29 U.S.C. § 1399(B)(2)(B). If the employer still disputes the outcome, it may request arbitration of the matter pursuant to 29 U.S.C. § 1401(a)(1),[21] which provides:

> (1) Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration. Either party may initiate the arbitration proceeding within a 60–day period after the earlier of—

---

**19.** One court specifically found that the definition of "employer" in Subchapter I of ERISA, 29 U.S.C. § 1002(5), applies equally to Subchapter III, at issue in this case. *Central Pennsylvania Teamster's Pension Fund v. Service Group, Inc.*, 645 F.Supp. 996 (E.D.Pa.1985). Other courts have applied Section 1002(5) without any explanation. *See, e.g., Dorn's Transportation, Inc. v. Teamsters Pension Trust Fund*, 596 F.Supp. 350, 352–53 (D.N.J.1984), *aff'd*, 787 F.2d 897 (3d Cir.1986); *Bennett v. Machined Metals Co. Inc.*, 591 F.Supp. 600, 608 (E.D.Pa.1984); *Miami Valley Carpenters Dist. Council Health & Welfare Fund v. U.S. Fidelity & Guar. Co.*, 590 F.Supp. 61, 66 (S.D.Ohio 1984); *Combs v. Indyk*, 554 F.Supp 573, 575 (W.D.Pa.1982). The Second Circuit, considering the remedial and protective

purposes of the MPPAA defined "employer" as "a person who is obligated to contribute to a plan either as a direct employer or in the interest of an employer of the plan's participants." *Korea Shipping Corp. v. New York Shipping Ass'n*, 880 F.2d 1531, 1537 (2d Cir.1989).

**20.** Complete withdrawal is defined at 29 U.S.C. § 1383; partial withdrawal is defined at 29 U.S.C. § 1385.

**21.** If no arbitration is initiated and the employer fails to satisfy the withdrawal liability as scheduled, the plan sponsor may bring a collection action in a state or federal court of competent jurisdiction. 29 U.S.C. § 1401(b)(1).

(A) the date of notification to the employer under section 1399(b)(2)(B) of this title, or

(B) 120 days after the date of the employer's request under section 1399(b)(2)(A) of this title.

Once the arbitration proceedings are complete, any party thereto may bring an action in federal court, within 30 days of the award, to "enforce, vacate, or modify the arbitrator's award." 29 U.S.C. § 1401(b)(2); *see also* 29 U.S.C. § 1451 (Civil Actions). Ordinarily, interim payments of withdrawal liability must be made to the pension plan during the pendency of any dispute. *Marvin Hayes*, 814 F.2d at 299.

## III. DISCUSSION

Analysis of the issues here necessitates making very strict distinctions on a couple of matters. The parties, particularly the plaintiff, continuously blur these issues.

First, a distinction must be made between the pursuance and/or outcome of any *commercial* arbitration required by contract and *statutory* arbitration required by MPPAA. In this context, lines must be carefully drawn around the authority of the commercial arbitrator, the authority of the statutory arbitrator, and the authority of the courts. Second, a distinction must be made between the *withdrawal liability* of an employer arising under MPPAA and the *indemnification duty* of a party arising under a contract. These distinctions will be strictly adhered to in the discussion which follows.

The leasing agreements between the parties required commercial arbitration of contractual disputes. *See*, Appendix B, ¶ 16; Appendix C, ¶ 19.[22] To the extent these arbitrations were pursued and awards obtained, they merely addressed ordinary *contractual* interpretation, i.e., matters of state law. The arbitrator in such matters had no

authority to rule on issues properly consigned to statutory arbitration (e.g., whether there was withdrawal liability and, if so, in what amount) or to rule on matters relegated to the courts (e.g., who is an "employer" under MPPAA). Neither did any such arbitrator have the authority to require that a statutory arbitrator make an "employer" determination. This distinction is relevant here for two reasons, one relating to the commercial arbitration between Commercial Drivers and ABARTA and the other relating to the commercial arbitration between Commercial Drivers and CCB.

■ Regarding the arbitration between Commercial Drivers and ABARTA, plaintiff seems to believe that the commercial arbitrator's award in its favor somehow amounts to a determination that ABARTA is an "employer" within the meaning of MPPAA and, therefore, liable for the entire withdrawal liability. This cannot be so since the commercial arbitrator would have had no authority to decide that issue.[23] The purpose of the commercial arbitration was to settle a dispute about contractual duties. At best, the arbitrator's award construed the terms of the leasing agreement as requiring ABARTA to *indemnify* Commercial Drivers for that portion of the withdrawal liability that could be attributed to services ABARTA received. Thus, the arbitrator found that ABARTA must indemnify Commercial Drivers for only a part of the entire withdrawal liability.

To date, Commercial Drivers has apparently demanded that ABARTA indemnify it for the *full* amount that Commercial Drivers paid to the FUND for withdrawal liability. Commercial Drivers does so on the theory that apportionment of withdrawal liability is not permitted under MPPAA.

Without delving deeply into the law on the issue, the Court accepts as correct plaintiff's position that withdrawal liability is not apportionable. That fact, however, would be of

---

22. The 1977 Agreement between Commercial Drivers and CCB did not require arbitration.

23. Even a finding by a court of law that an entity is not an "employer" under MPPAA would not dispose of the question of whether that entity may still be required, on some other theory, to reimburse the employer for withdrawal liability

paid by the employer. For example, an entity may have a contractual duty to indemnify. That contractual duty does not convert the entity into an "employer." Here the arbitrator was merely determining a contractual duty. He was not making, and could not have made, any determination that ABARTA was an MPPAA "employer."

no consequence here because, since ABARTA has never been found by a court of competent jurisdiction to be an "employer" within the meaning of MPPAA, its liability is not "withdrawal liability." Rather, its liability is contractual in nature, that is, the arbitrator found that, under its contract with Commercial Drivers, ABARTA was required to indemnify Commercial Drivers for a portion of Commercial Drivers' withdrawal liability.

These hairline distinctions are very important here. While withdrawal liability may not be apportionable, it does not amount to apportionment to say that ABARTA must indemnify Commercial Drivers for part of the withdrawal liability. ABARTA's duty arises under the leasing agreement and it cannot be argued that ABARTA is liable, under that agreement, for more than the contracted services. This is precisely what the arbitrator found. Furthermore, the leasing agreement between Commercial Drivers and ABARTA, relevant portions of which are attached as Appendix C, says the very same:

> 11. Lessee [ABARTA] shall bear full responsibility for any withdrawal liability ... if such liability arises with respect to or in connection with the drivers provided to Lessee under this Agreement or contributions with respect to such drivers. Further, Lessee shall indemnify and hold Lessor harmless from such withdrawal liability that may be asserted against Lessor and any costs, fees or expenses related thereto.

Under the commercial arbitrator's award, Commercial Drivers has the duty to submit an itemized invoice to ABARTA indicating the dollar amount of ABARTA's contractual liability to indemnify, including related costs, fees and expenses. While this figure may admittedly be difficult to determine, plaintiff's duty remains. Until such actual demand is made, ABARTA need not and, in fact, cannot pay.

Once Commercial Drivers submits its invoice, if ABARTA contests the figure, that is another matter for commercial arbitration under the contract, the dispute being contractual in nature. The arbitrator's task would not be to determine an amount of "withdrawal liability" since that has already been determined. Rather, the arbitrator would have to determine how much ABARTA owes under the terms of the leasing agreement.[24]

As regards the commercial arbitration between Commercial Drivers and CCB, the reasoning is essentially the same. Despite the fact that the arbitration award was vacated, certain legal principles remain. To illustrate these legal principles and for purposes of this discussion, the Court will refer to the award of the arbitrator as if it had not been vacated and remanded.

The commercial arbitrator issued an award in favor of Commercial Drivers for $63,858 (i.e., three quarterly payments) with the added provision that Commercial Drivers should bill CCB for subsequent quarterly payments as they were made. This amounted to a finding that CCB was contractually obligated to indemnify Commercial Drivers for the withdrawal liability that Commercial Drivers had already paid.[25]

In addition, the arbitrator stated:

> 3. Claimant [Commercial Drivers] is ordered to cooperate fully with Respondents [CCB] in the assertion of any and all defenses which may be presented to oppose a finding of withdrawal liability against Teamsters Union Local 293 Pension Plan, including the initiation of any arbitration proceedings pursuant to 29 U.S.C. § 1401 upon the written request of [the] Respondent to do so. If so requested, Claimant shall initiate such arbitration and shall request that Respondents be made parties to the arbitration. In the event the arbitrator of any such arbitration refuses to make Respondents parties to the arbitration,

---

**24.** Once that dollar amount is determined and the arbitrator's award issued, Commercial Drivers would arguably have the right to bring an action to enforce the arbitration in federal court under the Federal Arbitration Act. It would be premature to decide that jurisdictional issue now.

**25.** As with ABARTA, this award did not amount to a finding that CCB was an "employer" under MPPAA or that CCB had any withdrawal liability. It was simply a contract-related indemnification award.

Claimant shall provide Respondents with full opportunity to be heard through the presentation of Claimant's defense against the Pension Plan claims of withdrawal liability. In presenting any such defenses, and regardless of whether Respondents are parties to the arbitration, Respondents shall be entitled to select counsel of their choice, and all costs and expenses of presenting such defenses shall be borne by Respondents.

In its brief in opposition to the motion, Commercial Drivers makes much of the fact that CCB, in the course of the parties' attempt to join CCB to the statutory arbitration, strenuously opposed presentation of the question of who is the actual "employer." Apparently, Commercial Drivers thinks that because a commercial arbitrator ordered the parties to try to get CCB into the statutory arbitration that this somehow confers jurisdiction on the statutory arbitrator to resolve the "employer" issue or to allow someone who is not an employer to participate in the arbitration which, by statute, requires involvement of only the employer and the FUND. Even if that were the intention of the commercial arbitrator, which this Court doubts, he had no such authority.

It is very clear to this Court that the arbitrator merely wanted Commercial Drivers to understand that it had the responsibility to do all it could to reduce its withdrawal liability so as to reduce the amount which CCB would be required to indemnify. It is also clear that the arbitrator recognized that CCB, as an indemnifier, had a strong interest in the outcome of any statutory arbitration aimed at determining the amount of withdrawal liability. That is why the arbitrator ordered Commercial Drivers to attempt to have CCB joined as a party to the statutory arbitration or, failing that, to at least consult CCB every step along the way.

CCB was not wrong to oppose arbitration of the question of who is the "employer." As already stated, this is a matter for a court to decide. Commercial Drivers, inexplicably, made no attempt to delay the statutory arbi-

tration so that it might seek a declaratory judgment on the "employer" question.

All that having been said, and in light of these very technical distinctions which have just been discussed at length, the Court now turns to the motions as they relate to the complaint.

If there is original jurisdiction in this Court, it could only be under Count II, the alleged ERISA claim. Therein, Commercial Drivers asserts that CCB and ABARTA are the "employers" for MPPAA purposes. Commercial Drivers seeks a declaration to that effect and an order requiring defendants to pay the entire withdrawal liability amount, plus costs, fees and expenses.

The Court is of the view, as are the defendants, that a very recent unpublished decision of the Eastern District of Pennsylvania is instructive. In *Vare v. Philadelphia Elec. Co.*, No. 93–1341, 1994 WL 8144 (E.D.Pa. Jan. 12, 1994), under facts quite similar to this case, the court framed the issue as follows:

> whether a party who voluntarily satisfies liability assessed against it for withdrawal from a pension fund ... may assert a federal cause of action for indemnification or contribution against one alleged by the assessed party to be the real or a joint employer.

*Id.*, slip op. at *1. In granting the defendant's motion to dismiss,[26] the Court held that

> [t]he claim of a party who has satisfied a demand for withdrawal payments that it is entitled to be indemnified or reimbursed for its payment or a portion thereof by another under a contract, however, does not arise "under" MPPAA [and the] refusal of a third party to honor the request of an assessed employer to reimburse it for withdrawal payments pursuant to a "labor costs" reimbursement provision in a contract between them is not an act "under" MPPAA.

*Id.*, slip op. at *4.

Commercial Drivers argues that *Vare* can be distinguished in that the court stated that

---

**26.** The dismissal was "without prejudice to plaintiff to pursue any state law claim for indemnification, restitution or breach of contract that may be appropriate." *Vare v. Philadelphia Electric, supra*, slip op. at *4.

plaintiff "[did] not appear seriously to contest that it was a MPPAA employer." *Id.*, slip op. at *2. The *Vare* plaintiff never pursued the statutory arbitration but simply paid the assessed withdrawal liability and then sued for indemnification. Commercial Drivers asserts that it, unlike Vare, did pursue arbitration and has obtained, by way of settlement, a determination of the amount of withdrawal liability. Commercial Drivers asserts that all that this Court need do is decide who is the real "employer" and then that entity will have to pay the withdrawal liability.

■ This Court does not accept plaintiff's view. The statutory scheme is clear: if you oppose the fact or amount of assessment, arbitrate. If you think you are not the "employer" but someone else is, seek a declaratory judgment prior to or pending the arbitration. This Court is of the view that, by entering into a settlement in the course of the arbitration, rather than seeking a court ruling on who is the "employer" so as to assure that the actual employer could participate in the arbitration and settlement, Commercial Drivers effectively admitted that it was the "employer" and waived any right to subsequently assert that defense. Therefore, Count II clearly fails to state a claim and on that basis alone it could be, and should be, dismissed under Rule 12(b)(6).

■ Alternatively, the Court is of the view that it has enough before it to issue summary judgment on Count II, that is, on the identity of the "employer" under these facts.[27] This is the better route. Therefore, the Court turns to that discussion.

As noted in footnote 19 above, several courts have applied the definition of "employ-

er" found in ERISA Subchapter I, 29 U.S.C. § 1002(5), to the provisions of Subchapter III, which contains MPPAA.[28] Section 1002(5) provides that

The term "employer" means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity.

Courts of the Second Circuit have looked to this section for guidance and have construed the term "employer" as used in the MPPAA to mean "a person who is obligated to contribute to a plan either as a direct employer or in the interest of an employer of the plan's participants." *Korea Shipping Corp. v. New York Shipping Ass'n*, 880 F.2d 1531, 1537 (2d Cir.1989), *aff'g* 663 F.Supp. 766 (S.D.N.Y.1987).

This Court finds the Second Circuit's definition to be more helpful than what is found in Section 1002(5).[29] Particularly helpful is the notion of "obligat[ion] to contribute to a plan." Using that concept, the Court can look to see who actually bore what obligations in the instant case. For that reason, the Court must look to the leasing agreements.[30] *See* Appendices A, B and C for relevant portions of the contracts.

The leasing agreements with CCB state explicitly that the Lessor, i.e., Commercial Drivers, is the employer. Appendix A, ¶ 4; Appendix B, ¶ 2. The leasing agreement with ABARTA contains no such explicit provision.

The leasing agreements state that it is the Lessor that has the sole authority to enter into labor negotiations and contracts, to set

---

**27.** Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

**28.** This is apparently deemed superior to applying a common law definition of "employer"

(which depends on factors such as control and supervision of work, payment of wages, and the right to hire and fire) or a dictionary definition of the word.

**29.** The Court has found, and the parties have supplied, no Sixth Circuit authority defining "employer" under MPPAA.

**30.** Looking to the leasing contracts assists the Court in understanding the parties' relationship under each contract. The Court does not view this as an application of any common law principles.

labor policies, to participate in grievance procedures Appendix A, ¶ 12; Appendix B, ¶ 3. *See also,* Appendix C, ¶ 20.

All of the leasing agreements provide that the Lessor has the duty to make all payroll deductions, make payments to the government for same, provide workers' compensation insurance, and prepare and file all required reports. Appendix A, ¶ 4; Appendix B, ¶ 7; Appendix C, ¶ 5.

All of the leasing agreements make clear that the Lessor, not the Lessee, has the duty to hire, fire, and discipline drivers. Appendix A, ¶ 3; Appendix B, ¶¶ 2, 3, 4; Appendix C, ¶¶ 3, 4.

Finally all of the leasing agreements provide that the Lessee must reimburse the Lessor for the drivers' gross compensation, all taxes, and workers' and unemployment compensation contributions. In addition, each agreement provided that the Lessee would pay to the Lessor a certain percentage of the drivers' wages in return for the various services provided by the Lessor. Appendix A, ¶ 5 and Schedule A; Appendix B, ¶ 11; Appendix C, ¶ 9.

Two of the leasing agreements provide that the Lessee shall have the authority to control and supervise the drivers vis-a-vis the Lessee's day-to-day operations. Appendix A, ¶ 10; Appendix C, ¶ 14.

Only the leasing agreement with ABARTA specifically addresses indemnification of withdrawal liability, requiring ABARTA to indemnify for such liability "if [it] arises with respect to or in connection with the drivers provided to Lessee under this Agreement or contributions with respect to such drivers." Appendix C, ¶ 11.

There is no dispute that Commercial Drivers was obliged by the terms of the collective bargaining agreements with the Union to make contributions to the FUND which were then reimbursed by CCB and ABARTA. Among these parties, *only* Commercial Drivers was a signatory to those CBA's. In fact, as noted above, Commercial Drivers made quite clear in the leasing agreements that it alone had the authority to negotiate and enter into labor contracts.

Taking all of these undisputed facts into consideration, the Court finds that the *obligation* to make pension contributions fell to the employer and the employer was the signatory to the CBA's. Had Commercial Drivers refused or failed to make such contributions, the FUND would not have been able to force CCB or ABARTA to make them. CCB's and ABARTA's obligation arose solely from the contract. That obligation was an obligation to indemnify Commercial Drivers for the amounts contributed to the FUND, not to contribute directly to the FUND.

A further fact which convinces this Court that Commercial Drivers recognized that it was the sole employer was the specific provision in the 1991 leasing agreement with ABARTA whereby ABARTA was required to indemnify Commercial Drivers for any withdrawal liability resulting from services performed by Commercial Drivers' employees for ABARTA. There was no contractual agreement that ABARTA would be considered the "employer." Rather, there was a contractual agreement of indemnification, so that the real employer (Commercial Drivers) would not bear the potential financial burden of withdrawal liability.[31]

Accordingly, because Commercial Drivers has voluntarily entered into arbitration and settlement of the amount of withdrawal liability owed[32] and because Commercial Driv-

---

**31.** Arguably this same indemnification requirement is also contained, though less specifically, in the CCB leasing agreements. This Court need not decide that *contractual* issue. It does appear, however, that such was the view of the commercial arbitrator in the award *that* has since been vacated and remanded by the Court of Common Pleas. This Court also notes that the state court remanded the matter, not for any essential disagreement with the underlying substance of the arbitrator's decision that indemnification was due and owing, but only because it was the state court's view that the arbitrator had exceeded his authority by considering the matter under both the 1977 and the 1986 agreements, when only the 1986 agreement required arbitration.

**32.** As an aside, the Court wonders how Commercial Drivers, if it felt so very strongly that it was not the "employer," could have presumed to enter into a settlement agreement which someone else was going to have to pay. It seems

ers, in this Court's view, was indeed the only party *obligated* to contribute to the FUND, summary judgment on the issue of who is the "employer" is entered in favor of the defendants and against Commercial Drivers. This disposes of Count II, the only basis for federal question jurisdiction.[33]

Counts I and III are dismissed without prejudice to plaintiff's bringing the same or similar claims in an appropriate state court.[34]

## IV. CONCLUSION

For the reasons discussed above, summary judgment is entered in favor of all of the defendants on Count II of plaintiff's complaint. This Court declares that plaintiff is the "employer" within the meaning of MPPAA. The Court declines, pursuant to 28 U.S.C. § 1367(c)(3), to exercise jurisdiction over the state claims contained in Counts I and III. Therefore, these counts are dismissed without prejudice.

IT IS SO ORDERED.

## APPENDIX A

The February 1977 Agreement between Commercial Drivers and CCB's predecessor (Soft Drink Carriers, Inc.), a copy of which is Exhibit A to the Complaint, included the following provisions, relevant to the discussion in the attached Memorandum Opinion and Order:

1. That Lessor will furnish to Lessee such drivers as Lessee may request to operate motor vehicles owned or leased Lessee. All drivers so furnished shall be competent and experienced, and shall possess such driver qualifications as may be required by [state and federal regulatory agencies].

\* \* \* \* \* \*

3. *At the request of the Lessee and upon receipt of a written complaint* specifying that an employee of Lessor has been dishonest; or drunk while on duty; or carrying an unauthorized passenger; or failed to report any accident which the employee is aware of; or failing to meet the minimum requirements for driving under [various regulations]; or for any other good and justified reason; then *Lessor shall remove such driver from the service of the Lessee and furnish a substitute* as soon as it is reasonably possible to do so.

4. *That Lessor is the employer of drivers that are utilized by the Lessee* and that Lessor with respect to drivers furnished to Lessee will:

a. Make all proper payroll deductions ... from the compensation paid to said drivers for services performed for Lessee;

b. Make all payments ... to the proper governmental agency or authority, required under state and Federal laws to be made by Lessor as the employer of said drivers;

c. Provide Workmen's [sic] Compensation insurance coverage ...;

d. Prepare and file ... all returns and reports required in connection with a, b and c, above;

\* \* \* \* \* \*

5. That Lessor shall submit invoices weekly, ... and Lessee shall pay such invoices.... For each driver furnished to Lessee, Lessor will be paid in accordance

---

more likely that Commercial Drivers knew it was the "employer."

**33.** The Court notes that a determination that CCB and ABARTA are not "employers" within MPPAA is not a determination that they completely escape liability. *See* note 23 *supra.* ABARTA clearly has a duty to indemnify under the terms of its leasing agreement; CCB arguably has the same duty.

**34.** As noted in the discussion above, despite plaintiff's assertion that jurisdiction over Count III is based in the Federal Arbitration Act, this Court disagrees, at least at the present stage of the proceedings. It may be that *if* Commercial Drivers makes a specific demand for payment from ABARTA, consistent with the commercial arbitrator's award (its present demand is *in* consistent with the arbitrator's award), and *if* ABARTA opposes that demand, and *if* the two parties seek to arbitrate their contractual dispute regarding the precise amount of indemnification, and *if* an arbitrator's award of a precise amount to Commercial Drivers is not subsequently paid, *then* Commercial Drivers might have a cause of action for enforcement under the Federal Arbitration Act.

with the provisions of Schedule "A" attached hereto and made a part of this Agreement.

\* \* \* \* \* \*

10. *That Lessee at all times will solely and exclusively be responsible for* maintaining operational control, direction, and supervision over said drivers, such control, direction and supervision including, but not being limited to, scheduling and dispatching of the drivers, routing instructions, loading and unloading procedures, and all other matters relating to *the day-to-day operations of the Lessee....*

11. That this Agreement shall be binding upon Lessor and Lessee, their successors, legal representatives and assigns.

12. *Lessor will have sole control and responsibility for and will be sole signatory under and connected with all labor negotiations, grievances, collective bargaining agreement* and related items concerning drivers furnished to Lessee under this Agreement. Lessee agrees not to violate the terms of any collective bargaining agreement which Lessor may sign with respect to the drivers hereunder. Lessee agrees to indemnify Lessor at Lessor's out-of-pocket cost for any payments Lessor may make to drivers for services not actually performed as a result of a final and binding result of a grievance-arbitration provision, or settlement of a claim arising out of any collective bargaining agreement Lessor may have covering such drivers provided however that Lessee shall have final approval of a settlement, which approval shall not be unreasonably withheld.

\* \* \* \* \* \*

Schedule A, referred to in Paragraph 5, provided:

1. Lessee shall pay to Lessor for each driver furnished by Lessor to Lessee a sum of money equal to the gross compensation due and payable to each such driver in accordance with all of the terms and conditions of the [applicable] Collective Bargaining Agreement ... binding upon Lessor at any time during the term of this Agreement.

2. Lessee shall also pay to Lessor upon receipt from Lessor of an invoice in the appropriate amount, such sums as shall be properly due and payable by Lessor to or on behalf of each such driver for all federal, state or local taxes, workmen's compensation contributions, unemployment compensation contributions and any other amounts which are not specified herein but which be required by law.

3. Lessee shall also pay to Lessor, for Lessor's services, a sum of money equal to Nine Percent (9%) of the gross earnings of each driver furnished by Lessor to Lessee pursuant to the Agreement to which this Schedule "A" is attached.

4. Lessee shall pay to Lessor such additional sums, as and for extraordinary compensation, as the parties hereto may hereafter mutually agree.

(All emphases added by Court).

### *APPENDIX B*

The December 1986 Agreement between Commercial Drivers and CCB's predecessor (Great Lakes Canning, Inc.), a copy of which is Exhibit B to the Complaint, included the following provisions, relevant to the discussion in the attached Memorandum Opinion and Order:

1. Lessor is an independent contractor of Lessee and that the agents, employees or servants of either party are not, nor shall they be considered, the agents, employees or servants of the other.

2. *Drivers employed by Lessor shall not be employees of Lessee, nor shall they be considered or treated as employees of Lessee.* Lessee shall have no obligation or right to supervise, assign, direct, discipline, discharge or control in any manner said Lessor's drivers. *Lessor shall have the sole right and obligation to supervise, assign, direct, discipline, discharge and control each and every driver which it employs* in the performance of the Agreement; provided however, discipline shall be subject to the terms of any applicable collective bargaining agreement.

3. *Lessor shall have exclusive responsibility for the establishment and administration of all labor relations policies and practices for its employees.* The determination of labor relations policies and practices for Lessor employees is not subject to negotiation between the parties and Lessor's decision regarding its labor relations policies and practices are final. *Lessor shall retain the sole right to select, hire, fire, discipline, train, evaluate, transfer among its customers and adjust complaints for its employees. Lessor shall have sole control over and responsibility for determining the terms and conditions for employment for its employees,* including but not limited to setting wage rates and wage increases, providing fringe benefits, determining the effective date for granting or withholding such wages and benefits, and implementing any other measures necessary to carry out its functions as the exclusive employer of the drivers. *It shall be the sole responsibility and duty of Lessor to conduct all labor negotiations, to enter into collective bargaining agreement on its own behalf, to handle all grievances and arbitrations* which may arise thereunder, and to otherwise deal with all labor unions or bargaining units which are in any way related to the drivers furnished under this Agreement.

4. *Upon the receipt of a written complaint from Lessee* specifying that an employee of Lessor has operated a vehicle in a reckless or abusive manner; has been under the influence of alcohol or unauthorized drugs or controlled substances; has carried an unauthorized passenger; has failed to report any accident of which the employee is aware; has violated any governmental rule, regulation, statute or ordinance ...; or has used a vehicle for any illegal purpose or for purposes detrimental to Lessee's business interest, *Lessor shall take prompt corrective action.*

\* \* \* \* \* \*

6. All drivers supplied by Lessor shall be competent and experienced and shall possess such driver qualifications as may be required by [state and federal regulatory agencies].

7. *Lessor shall make all proper payroll deductions,* ... required under federal and state law to be made from the compensation paid to Lessor drivers for services performed under this Agreement. *Lessor will make all payments,* ... to the proper governmental agency or authority required under state and federal laws to be made by lessor as employer of said drivers. *Lessor will provide such workers' compensation insurance coverage* for said drivers as may be required under state laws and pay the premiums therefor....

\* \* \* \* \* \*

11. Lessor shall submit invoices weekly, ... and Lessee shall pay such invoices.... For each driver who performs services under this Agreement, Lessor will be paid as follows:

(a) Lessee shall pay to Lessor, for each driver furnished by Lessor to Lessee, a sum of money equal to the gross compensation due and payable to each such driver in accordance with all of the terms and conditions of the [applicable] Collective Bargaining Agreement....

(b) Lessee shall also pay to Lessor upon receipt from Lessor of an invoice in the appropriate amount, which sums as shall be properly due and payable by Lessor to or on behalf of each such driver for all federal, state or local taxes, workers' compensation contributions, unemployment compensation contributions and any other amounts which are not specified herein but which may be required by law, or by reason of said Collective Bargaining Agreement.

(c) Lessee shall also pay to Lessor, for Lessor's service, a sum of money equal to 9% of the gross earnings of each driver furnished by Lessor to Lessee. Vacation weeks per regular driver are considered additional weeks and the service charge will be calculated as stated above.

(d) Lessee may pay to Lessor additional sums, such as incidental expenses, as the parties hereto may hereafter mutually agree.

12. Lessee agrees to indemnify and hold harmless Lessor at Lessor's cost, both direct and indirect, for any payments Lessor may make to drivers, whether or not for services actually performed, as a result of any determination or settlement of a claim or claims arising out of any collective bargaining agreement Lessor may have covering such drivers, or any action or claim instituted by a governmental agency or any other party, person or entity relative to or on behalf of such drivers.

\* \* \* \* \* \*

16. *Any dispute arising out of the terms of this Agreement shall be resolved under the laws of the State of Ohio by arbitration* in accordance with the rules of the American Arbitration Association, and judgement upon an award rendered may be entered in any court of competent jurisdiction thereof.

17. This Agreement shall be binding upon Lessor and Lessee, their successors, assigns and legal representatives.

(All emphases added by Court).

### APPENDIX C

The August 1991 Agreement between Commercial Drivers and ABARTA, a copy of which is Exhibit C to the Complaint, included the following provisions, relevant to the discussion in the attached Memorandum Opinion and Order:

1. Lessor shall provide Lessee with a sufficient number of drivers to operate the motor vehicles owned or leased by Lessee, as required by Lessee.

2. All drivers supplied by Lessor shall be competent and experienced and shall possess such driver qualifications as may be required by [state and federal regulatory agencies].

3. *Upon receipt of a written complaint from Lessee* specifying that a driver provided by Lessor has operated a vehicle while under the influence of alcohol or unauthorized drugs or controlled substances; has carried an unauthorized passenger; has failed to report any accident of which the driver is aware; has violated any governmental rule, regulation, statute or ordinance, . . .; or has used a vehicle for any illegal purpose or purposes detrimental to Lessee's business interest, *Lessor shall take prompt corrective action.*

4. Discipline of drivers, up to and including discharge, shall be subject to the terms of any applicable Collective Bargaining Agreement, if applicable.

5. *Lessor shall make all payroll deductions,* . . . required under federal and state law to be made from the compensation paid to Lessor's drivers for services performed under this Agreement. *Lessor will make all payments,* . . . to the proper governmental agency or authority required under state and federal laws to be made by lessor. *Lessor will provide such workers' compensation insurance coverage* for said drivers as may be required under state laws and pay the premiums therefor. . . .

\* \* \* \* \* \*

9. Lessor shall submit invoices weekly, . . . and Lessee shall pay such invoices. . . . For each driver who performs services under this Agreement, Lessor will be paid as follows:

(a) Lessee shall pay to Lessor, for each driver furnished by Lessor to Lessee, a sum of money equal to the gross compensation due and payable to each such driver in accordance with the terms and conditions of any applicable Collective Bargaining Agreement. . . .

(b) Lessee shall also pay to Lessor upon receipt from Lessor of an invoice in the appropriate amount, such sums as shall be due and payable by Lessor to or on behalf of each such driver for all federal, state or local taxes, workers' compensation contributions, unemployment compensation contributions and any other amounts including fees and expenses, which are not specified herein but which may be required by operation of law, or by reason of said Collective Bargaining Agreement, at any time.

(c) Lessee shall also pay to Lessor, for Lessor's service, a sum of eight percent (8%) of the drivers' wages. Vacation weeks per regular driver are considered

additional weeks and the service charge will be calculated as stated above.

(d) Lessee shall pay to Lessor additional sums, such as incidental expenses, as to which the parties hereto may mutually agree.

10. Lessee agrees to indemnify and hold harmless Lessor for any loss, cost and damages, including reasonable attorney's fees, and/or any payments Lessor may make to or for the benefit of drivers, whether or not for services actually performed, as a result of any determination or settlement of a claim or claims arising out of any Collective Bargaining Agreement Lessor may have covering such drivers, or any action or claim instituted by a governmental agency or any other party, person or entity relative to or on behalf of such drivers.

11. *Lessee shall bear full responsibility for any withdrawal liability* under Subtitle E of Title IV of the Employer Retirement Income Security Act of 1974, as amended, assessed at any time *if such liability arises with respect to or in connection with the drivers provided to Lessee under this Agreement* or contributions with respect to such drivers. Further, Lessee shall indemnify and hold Lessor harmless from such withdrawal liability that may be asserted against Lessor and any costs, fees or expenses related thereto.

\* \* \* \* \* \*

14. *Lessee, at all times, will solely and exclusively be responsible for* maintaining operational control, direction, and supervision over said drivers, such control, direction and supervision including, but not being limited to, scheduling and dispatching of the drivers, routing instructions, loading and unloading procedures, and all other matters relating to *the day-to-day operation of the Lessee.*

\* \* \* \* \* \*

19. *Any dispute arising out of the terms of this Agreement shall be resolved under the laws of the State of Ohio by arbitration* in Cleveland, Ohio in accordance with the rules of the American Arbitration Associa-tion, and judgment upon an award rendered may be entered in any court of competent jurisdiction thereof.

20. *As a Collective Bargaining Agreement has been entered into between ... Commercial Drivers and [the Union]* representing drivers furnished to ABARTA ... this Agreement shall continue in force during the term of such Collective Bargaining Agreement ...

(All emphases added by Court).